Illinois Appellate Court, 2nd Division is now in session. Honorable Justice Michael Heinrich is up. Please be seated. Ma'am Clerk, please call the case back up for this morning. Thank you very much. I'm sorry for the inconvenience. I hope you're going to help investigate all this. We appreciate it. Attorneys, please step forward. Please introduce yourselves and approximate how much time. Michael Weinberg from Novak and Macy for the appellant. And Rita Powers from Greenberg Tribe. I'm half of the appellant. Okay. About how much time do you... Well, I'm going to take full advantage of the time that's afforded by the rule. Okay. And I'm not going to even cover everything I need to in that. Well, we will not... As long as you don't repeat. I'll never not repeat. You'll get more time if you give him more time. Sure. That's fine. As I understand, it's 20, 20, 10, approximately. Approximately, yeah. Within a range. We don't want to be here all day. Understood. Thank you. Fair point. Thank you. Thank you. May it please the court, my name is Michael Weinberg, and I represent the appellant BB&A Venture. I will refer to my client as landlord and appellee as the tenant. This dispute, decided on summary judgment below, arises out of the party's 60-year non-recourse lease for the land underlying Chicago's Drake Hotel and raises the question of whether Section 2.12 of that lease, entitled Increases in Minimum Ground Rent and Additional Ground Rent, is a liquidated damages provision which operates as an unenforceable penalty. Because tenants' penalty argument is raised as an affirmative defense, tenant bears the burden of proof. In my remarks, I will touch on two major topics. First, why Section 2.12 is not a liquidated damages provision that functions as an unenforceable penalty, which will include, among other things, a discussion of why the very concept of liquidated damages provisions or penalties makes no sense in the context of this non-recourse lease, where landlord's sole remedy is repossession of the property. And second, why even if Section 2.12 was a liquidated damages provision, tenant failed to meet its burden below of proving that it operated as an unenforceable penalty. If time permits, I will also address why tenant's alternative ground for upholding the judgment below is not properly before this court and even if it were, is without merit. Landlord recognizes the initial curb appeal of tenant's penalty argument. Tenant's weighing of the modest decrease in rental revenue that landlord experienced in 2014 against the substantial rental increases that Section 2.12 would impose on tenant, which I'll call the rent versus rent comparison, reveals an obvious disparity between those two dollar amounts. But that imbalance proves under scrutiny to be artificial and in any event irrelevant. Keeping in mind, as landlord and tenant both agree, that the penalty concept only applies with respect to contract provisions that stipulate liquidated damages for a breach, tenant cannot advance a penalty theory that makes sense in the context of a lease that precludes landlord from recovering any monetary damages from tenant. Well, it seems like, if I'm reading the tenants brief correctly, that they're conceding that operating the property other than in compliance with 6.4a would be a breach. Okay, so let's analyze that. I think their analysis actually is flawed, but they have to prove some breach. So let's just say that's the breach. They actually equate a breach of 6.4a, which I don't think is a provision you can breach, with 6.5, which is a provision you can breach. So let's assume that's the breach. And a breach of 6.5 is a material breach of a lease. So now their analysis is this. Look, there's this breach we committed. Okay, let me stop right there. What's our remedy? If you take 2.12 by a lease, let's just scratch it out right now. It's gone. Then you get the property. What are we left with? That's our only remedy is we recover the property. So how does this make any sense? What 2.12 says is you've got a way to avoid us taking you out of the property. You can pay higher rent. Or if that's gone, then we just have one recourse. That's to take the property back. That's the same thing that Ali is saying, oh, this is a horrible result. That's all we really want to get the property back. We don't need 2.12 to get the property back. We get the property back just under the normal remedy provided in the lease. That is what the standard remedy is. So 2.12 doesn't change the game in any way. 2.12 adds a factor, a new factor that says, let me stop for a second. We don't agree that 2.12 is about a breach. Okay, that's not our construct. But if I try to cram our analysis into a breach context, I guess what I'd be saying is 2.12 says if you commit this supposed breach, there's a way for you to stay in the property by paying more rent. If you want to get rid of that and take it out of the lease, then what you're left with is signing out. We get the property back. Why won't under the section 21.1C on page 8119 of your appendix. 21.1C, yes. Okay. Under C, why or why not would there, would there not be determined to be a default for the failure of a tenant to abide by the requirements set forth in 6.48? That is, by not keeping the property to the standard that was the Drake Hotel the day before they entered into the lease, why would that be a failure to perform, and usually with failure, covenants, conditions, and agreements in the lease? Because 6.4 is just a course of operation that you're afforded. You're also afforded 6.4B. Either one of those is permitted. You're not mandated to do either one. You can pick one. No, but if you do not abide by 6.4 at all, 6.4A are you talking about? Yes. I'm sorry. Then under, what I'm saying is, would it be a default under 21.1C, which says that if you don't perform the covenants, this is a, it's supposed to, one of the conditions of the agreement is if you're going to operate as a hotel, you have to keep it in a certain type of condition. That's correct. And that is not, that can be breached. It can. And that's actually the one that says if you want to operate as a hotel, you have to have a certain condition of 6.5. That's where that threshold is established. 6.4A uses a different language. They don't, 6.5 and 6.4A are not couched in the same terminology. But if you take 6.5, that would still come under C, which would be a default. That's a default. If you don't adhere to 6.5, you're in default. Okay, and if you're in default, then you go to 21.2, which is remedies in the event of defaults, and that says that in events of a default, that's a breach of this lease. That's right. So then, so now we have a breach. So then the question is, we have liquidated damages. Let me stop you for a second. Go ahead. I don't conceive that a, that failing to do a 6.4A hotel is de facto failing to do a 6.5 hotel. All right? They are different, they have different criteria. You can fall short of 6.4A and still not breach 6.5. If you look, and the law says if you use different language, different meaning is intended. But if that's where you want to go, I'm fine with that, because if it's a breach, and if this provision is about a breach, then we don't need 2.12. Okay, they're a breach. Now what's my, what's, as a landlord, what's my opportunity? My opportunity is to say, I'm sorry, you've breached the lease. You, my remedy is to throw you out. I can't get money from you. I can't say your breach cost me 50,000 or 500,000 or 5 million in damages. Write me a check, because I can't, that's precluded by the lease. All I can do is take the property back. And that's what they want to avoid. That's why there's, that's why they have 2.12. There's no relationship terminating, they're terminating the lease or walking away. For, in this case, say the gross revenue was $25,000 less than the year before. Compared to walking away, those two are not even in the same neighborhood. Well, let me talk about this comparison. The dilution in, first of all, the dilution in gross revenue was 2.4 million. The dilution in percentage rent was 20, about 25,000. But that's a false, that's the amount. Yeah, but that's a false, a false weight. The reason you want the hotel to be of a certain standard, if that's the breach. The reason you want it to be of a level of quality in maintenance and operation is because that lends value to the building, the value to the hotel. A hotel that's operated at that level is worth X. A hotel that's operated at a lower level is worth half X. So when you're figuring out what the breach of that covenant entails, it's not just a single year you get a little less rent. This property is coming back, either upon a breach or one day, to the landlord. That landlord wants to have the property come back to it. So in assessing what the weight should be, it's not this sort of perfunctory weighing of this one-year rental versus the long-term rental increase. It's a more comprehensive analysis of what's the impact of that breach on the hotel. That impact. Again, if I'm going to look at this through a lens of damages and breach, which is not the right lens, I don't think, here, because I don't think 2.12 is that type of contract. But if that's the lens we're going to look through it, then we have to say at the time of contract, and the party certainly could have looked ahead and said, look, one of the things you might do is screw up the value of this property by operating it not as a 6.4A hotel or not as a 6.5 hotel. And therefore, we're entitled to look ahead and set an amount of money that helps compensate landlord for the potential diminishment in value of the property that your non-adherence to that standard might... Okay. Accepting that, you can't just pick any number in the world, can you? I mean, doesn't the number you pick at that time of entering into the contract have to have some reasonable relationship to the actual loss that would occur? Sure. And let's look here. Remember what we're talking about. We're not talking about mom-and-pop pizza shop over on 79th Street. We're talking about the Drake Hotel, a property worth hundreds and hundreds of millions of dollars. One of the cases is about sophisticated boroughs, right? I don't see that as going anywhere. Well, no. They are sophisticated. So the point being here, picking a rent increase that puts 20 or 30 or $41 million in the pocket of the landlord over a span of 40 years is not necessarily an excessive amount of money relative to the potential diminution that it might face if that hotel is not... But you don't know what that potential is, first. And second, it's not over the period of 40 years. My understanding is they have to come up with the money, $22.5 million. Retroactive. Right now, and then it goes forward. That's a lot of money to come up with at one time, and that way they're pushed out. I mean, if they have to come up with their money, that is a... So that is a lot of money, but if business people, when they went into this and they chose not to follow the 6.4A road, they knew that they were potentially exposed to a retroactive rent increase. So the proper thing for a business person to do would be reserve for them and have that money in the event you breach. But again, the thing that's missing here is that this breach that we have to come back to, we don't have to worry about them coming up with the money or not. I have to ask you, Justice Hyman, where are we going to be left if you say to me, Mr. Weinberg, I don't think this 2.12 is fair. I'm going to take it out. Where do you leave the parties? And what status? That's, I think, the question you have to ask yourself. And the status you're going to leave the parties is in a status where we have no option, not because of the rent decrease of $25,000, but because of the noncompliance, because of the breach itself, the underlying breach. But isn't that true in every case where there's liquidated damages? That could be a result. That isn't what we're looking at. That's a possibility. If there's no other alternative, I understand. Yes. But that is not our problem. Our problem is to look at whether, under the law, liquidated damages, that amount makes sense. What you have to ask is, does it make sense relative to the relief that otherwise is available as what I'd call the regular remedy. It's not just looking at it in the abstract. It's looking at it against where you're left if you don't have the liquidated damages plausible. Where do you see that? Well, because we have a case that says it. I don't have a case. There's not one case that we had cited by any party involved in nonrecourse lease. So they always had a G.K. development. At the end of the day, the court said, I'm going to send you back down to the trial court, and you're going to adjudicate your actual damages and collect them. We don't have that option here. At the end of the day, all you're going to leave the parties with is one recourse. And what you need to do in deciding whether something's a penalty is, is the tenant worse off because of this than it was in the absence of it. That's what makes it a penalty. It makes it a penalty if you're putting the tenant in a worse position than it would be but for that provision. And that's not what's happening here. You're actually putting them in a better position. Because no matter what the right, at least it's an option. They don't have to pay that $22 million. They can walk away. But if they don't walk away, they're going to be thrown out anyway because of the underlying breach. There's no way out. The tenant is in a situation where it has no way to escape the possibility of losing the property. But they're going to catch $22. They are going to catch $22. And the only thing 2.12 does is give them Saudi Avenue, which may or may not be attractive to them, to escape that catch $22. They can pay more rent. And by the way, paying more rent, even a lot more rent, and even coming up with it all at once may be a good deal. We don't know because we don't know how much profit's being made on the property, whether even with the higher rent, by staying in, they're better off, and whether or not they made so much money during the years where they were otherwise not operating a proper hotel, but managing to keep their revenue going up, that they were making such excessive profits during that time that they can rarely pay for this rent increase. We don't know. But all I know is that there's no way. But you get, under the lease, you get regular reports from the tenant, right? Sure, we know if they're doing a deficient lease here. I'm not saying we wouldn't know it. I'm just saying as long as they could avoid that, they're able to bank more profit. Maybe they're making more profit because they're running a lesser quality hotel. If that's the case, you know, they can get away with it for a while, but eventually it catches up if they have a deficiency lease here. Explain to me why it is that the tenant isn't penalized simply because they have a deficiency lease year. You're going to throw them out. We are, but we're going to throw them out rather they don't have a deficiency lease year. That's what I'm trying to point out. The deficiency lease year is a red herring in this. The deficiency lease year only triggers an opportunity for the landlord to, say, pay us money, which the tenant doesn't have to do because it's a non-recourse lease. So the tenant, whether it pays it or not, if it doesn't pay it, they're not being thrown out at that point because they didn't pay it, though that could be an argument. They're being thrown out because they breached the lease by not fulfilling the covenant, just as Hyman pointed out. If you breach the covenant, you're going to get thrown out whether there's a deficiency lease year or not. That's not a penalty. The penalty has to be that the provision makes things worse for the tenant. That's my view. If something doesn't make it worse for you, it's not a penalty. If they can't continue to make money, it's not making it worse for them. Well, no, because they're going to get thrown out. Now, the choice here, the choice is not staying the property at the old rent or staying the property at higher rent. If that were the choice, then what you're all talking about or what some of you are talking about might make sense. But that's not the choice that's presented to this tenant. Well, first of all, we're not talking about it. We're just asking questions. I understand. No, no, of course. I'm not making a motion for this. I'm just trying to answer. But the choice is not staying the property, Justice Neville. The choice is be thrown out of the property because you breach the underlying covenant that allows the landlord to throw you out, or be thrown out of the property because you refuse to pay the higher rent, or stay in the property because you are willing to pay the higher rent. Those are three choices. That last choice, which is the best one for a tenant, perhaps, is taken away if you get rid of 2.12. But do you – what's your position with regard to comment C to section 356 of the restatement of torts? And considering – if we consider this a liquidated damage provision, how would we resolve this in your favor in light of that restatement which Illinois has adopted? There's nothing in C that changes the outcome here. C is talking about, you know, a penalty which is hidden or a penalty which is disguised or all sorts of other ways of trying to get around the apparent penalty. My point is there's nothing hidden or disguised here. There's nothing here that really falls within C. We know what we're talking about. Everyone knows what we're talking about. Both parties agree this is unambiguous and that it operates in the way you say it operates, right? Yes. Well, if you say it operates in the way we say it operates, then it's not – Well, there's no question, other than the one-year versus the multi-year, it operates to impose a higher rent if it's invoked. If the tenant chooses to pay it. Of course, it doesn't have to pay it because it's a non-recourse lease. It would have no exposure to the collection of that amount. Right. But, again, it operates that way. That's not something that – let me stop. That's something distinct from where the parties would be but for the presence of the provision, and that's what I keep coming back to. There's no way this particular tenant in this particular lease, if it breaches the underlying covenant, gets a pass to stay in the property. It either gets evicted for the breach of the underlying covenant or it gets evicted for non-payment of the additional rent that's assessed in 2.12 or it stays in the property because of the additional rent. But its options are enhanced, not diminished, by the presence of 2.12. I've spent a lot of time on this and it's obviously of great interest to the panel, but I also want to point out that the tenant failed to prove its case below. All right. It had the burden of proving the penalty, and it talked only about the $25,000 rent reduction in year 2014 versus the $22 million that it was going to have to pay in retroactive rent and said this is so imbalanced. But if you would agree with me, as I hope you will, that the breach of the covenant about hotel quality implicates more than just a single year of rent decrease. That it implicates a profound impact on the value of the property because you're not adhering to the standards that have been set for the hotel operation and maintenance. And if you're not maintained as a hotel and operated as a hotel at a certain level and you fall below it, the value of the property in the hotel diminishes. And since this is the property that landlord is leasing out and ultimately taking back, landlord has an interest in preserving that equity and that value. And therefore, one of the things the tenant had to take into consideration was this diminishment in property value. It never addressed it. And even though the circuit court said, look, we understand the possibility is you're going to get back a hotel of lesser value than the one you gave them. Yeah, that's the problem. That's why you're allowed to try to have a provision that addresses that problem. And to show it's a penalty, tenant had to induce evidence. They had to go forward. They had the burden as both the summary judgment movement and as the affirmative defense party to go forward and introduce evidence going directly to that diminishment in value proposition. It didn't do so. The circuit court let them off the hook. Didn't make them induce that evidence. In fact, the circuit court came up with excuses or speculation in favor of the movement, in favor of the party with the burden of proof on summary judgment, and said, well, maybe they'll fix the problem before the lease expires. Maybe they'll restore the hotel to its prior value. The circuit court couldn't speculate in favor of the movement. The circuit court couldn't make presumptions in favor of the movement or the party with the burden. And the reality is that the tenant never put forward any evidence on that subject, and notwithstanding that, was allowed to make its, what I would call, deceptive rent versus rent argument, because that is only a portion of the weight that has to be balanced. There's another thing on the landlord's side, diminishment in value of the property, that has to put on the scale. And by not putting that on the scale, they failed to meet their burden, and they were not able to prove below the summary judgment standards or the affirmative defense standards that there was a penalty. I think I've taken my 20 minutes, and I'll yield the floor. Thank you very much. Thank you. I'm going to stop looking. You don't have to time yourself. May it please the Court. Honorable Justices, I represent the employee, WWLD Hotel Investors, which we know to be the tenant in this case. When a contract specifies a single sum in damages for any and all breaches, even though it is apparent that they are not of all of the same gravity, the specification is not a reasonable effort to estimate damages. What's worse for the tenant? I'm sorry? What's worse for the tenant? Being kicked out with no recourse or having the option to pay increased rent and keep its leasehold. That brings up the discussion, Your Honors, between Section 6.5 and 6.4A, and what's worse. Under what's worse is the penalty provision. Why? Because under 6.5, if the tenant doesn't operate the hotel according to the pre-1979 standards, then it is, as Justice Hyman indicated, then you move to 21.2C under the normal remedies provision because we're in a non-monetary law situation. Which means the tenant loses the leasehold. Well, the tenant, no, no, no. First of all, the case law would indicate that you have to have a material breach. So there would be an analysis about how far off the tenant is in reaching the standards. Well, let's assume that the tenant made a decision in 2007 with the recession that nobody's paying 500 bucks a night for hotel rooms and we're operating at a 40% occupancy, we've got to do something about this. And so they decide we're going to decrease our room rates, we're going to compete with Marriott and Holiday Inn Express, and we're going to omit turndown service, and we're going to omit that white tablecloth restaurant and have a self-serve buffet. But they're able to maintain the rent because now we're up at 80% occupancy and so we're paying the rent as it's due. But for seven years, the quality of the hotel has gone down. And then in 2014, there's a deficiency lease year. There's $25,000 less than the year before. Landlord says then, time's up. I now have a lesser quality hotel. Maybe the landlord could have sued for breach before 2014, but in 2014 when there's a deficiency lease year, and at least according to the landlord, I now have a breach of 6.5 and I have a lesser quality hotel. Why isn't that foreseeable to the tenant, fair to the tenant, and fair to the landlord? Yeah, because viewed as a 6.5 breach, first of all, you wouldn't have to have a deficiency lease year. Right. You would admit that, right? Of course. I would admit the standard there, of course. So if the standard were breached, then you would proceed under the normal default provisions of the lease. You'd have an opportunity to show whether it was material or not. You'd have an opportunity to cure that doesn't exist in their version of the liquidated damages provision. You'd have an opportunity to bring the hotel back up. As with all non-monetary defaults or breaches, you have a 30-day period. It's kind of a very standard form. But if you're taking reasonable good faith efforts, there's a standard in there, too, that if you're being diligent in trying to cure, that you can have the amount of time that it takes to cure. And all of those safeties are in the non-monetary breach provision that would apply in a 6.5 default. What this penalty provision does is – But when you're talking about, let's say, just in my hypothetical – Sure. Tenant has now allowed the hotel to deteriorate year after year. We're not updating rooms. We're not having the same level of service, et cetera, et cetera. Tenant's argument focuses on, oh, my goodness, all of a sudden we're being called upon to pay $22 million as opposed to a $25,000 deficiency. In your scenario, the opportunity to cure would require the tenant to come up with the money immediately to upgrade the hotel, right? I mean, you wouldn't say, well, okay, we'll invest another $100,000 in maintenance over the next ten years and we'll eventually bring it back to its – A cure would mean you have to come up with the money right then and bring that hotel back. On the assumption that the condition was truly breached, and you have an opportunity to prove whether or not it was breached, and you have an opportunity to prove whether the breach was so much that it was material, and you have an opportunity to prove whether you took reasonable efforts and were given a reasonable time period to cure, you would have all those protections. Because that's what you do in arbitration, right? No, because 6.5 is not an arbitrable provision, which is another reason why some of the theory doesn't work. But – or 6.5 may be, but 6.4b is not. But in any event, Your Honor, you would have this opportunity to take actions that the Section 2.12 relying on a 6.4a breach doesn't allow. The whole point of a liquidated damage provision in general is to reduce the proof. You don't have to put on damages. You don't have to – you get to a quicker resolution, right? That's what they want to do. They want to race to judgment here. They want to race to judgment and say, well, because there was a dip in these revenues for the one year, for the one year, that we can bring this whole parade of horribles down, and you don't get to cure. There is no cure. You pay the increased rent for 40 years. We go back, back to 1999, before this client was even the tenant, I don't know. But still, for the tenant, you go back to the tenant's position to 1999. Before the 2039, you don't get to say, we didn't do it. You don't – That's not a surprise, right? That's what the provision – I mean, you agree it's unambiguous. It's not hidden, right? I mean, Mr. Weinberg said it. It's not hidden. You could have calculated that from day one. I mean, it was calculable. Well, it's not – But you couldn't have negotiated it, right? Which question was it? They're all the same question. They're basically all the same. Well, you're right. The provision was negotiated by the original parties to the lease, no doubt, okay? But the provision says – there's an important part of the enforcement, the Section 2.12 provision. And that's not just that the hotel is not up to the 1979 standards. But also, there's a second part about – and it caused a drop in gross revenues. Or gross receipts that results in the decline in percentage rent. So what the provision is saying is saying – it's not saying, like, you have to pay me because you didn't keep the hotel up to snuff. That's – they're saying you have to pay me because you want revenues to drop. That's what the provision says. Because they have conceded that if the hotel were just not – and there was no corresponding or resulting drop in revenues, no harm, no fault. I don't hear Mr. Weinberg to be saying that. I hear him to be saying, if you manage to maintain the revenue sufficient to pay the rent, even though the quality of the hotel is going down, that the landlord could sue for the breach of the covenant under 6.5 and throw the tenant out. The landlord could attempt to do that. But what he's saying – what I understand the landlord to be saying is, if the tenant manages to come up with a business plan that allows it to maintain the gross receipts, nevertheless, the quality of the hotel is declining, the landlord doesn't have to sit by for the next 20 years and allow it to go down because there's a breach. The landlord is not proceeding under 6.5. If the landlord chose to proceed under 6.5, the tenant would meet the demand, would have an opportunity to prove the materiality, the cure, et cetera. What the tenant is trying to do is say that because the revenues went down, I want this exorbitant damage 40 years in total. 20 years back, 24 years forward, for one dip. Whether it was a dollar, or in this case, $2.5 million that resulted in a $25,000 decrease in percentage rent. Whether it was a dollar, whether it was $100, whether it was $1,000. The landlord also says it doesn't matter when it happened. It doesn't matter whether this decline in the performance of the hotel coupled with the decline in gross revenues happened in the very first year of the lease, or you went on tenant and wonderfully did it for 59 years, but now you fell off the wagon, same penalty. It doesn't matter. Actually, according to the brief that was written to the appellate court, it doesn't even matter if what the tenant did was not operate a hotel at all, but go and operate an apartment building or something else, and the gross revenues fell. That's the key. And the gross revenues fell. Okay, you owe me 40 years worth of increased rent. We're going to go retroactive. We're going to go forward. It is the same penalty. It is the same penalty no matter when it happened. It is the same penalty no matter why it happened. It is the same penalty all the time. That is a quintessential textbook unenforceable penalty. So take what you say is the penalty out of the contract. Does that mean when next year the deficiency is $100,000 and the year after that the deficiency is a half a million and so on that the landlord has no remedy? By taking the – do you mean taking – Take your – the landlord can't escalate. We're saying that's the penalty. We're not talking about 2.12. It's out of the contract. It's out of the contract, unenforceable. Okay. And so you say you're doing – the tenant is doing the best it can to operate a luxury hotel. Nevertheless, $100,000, half a million, a million, 2 million, nothing the landlord can do, right? You mean the gross revenues are going down. Keep going. You're doing the best you can, but, hey, just can't make it. Not only do I say – Can't terminate the lease, can't do anything. Just has to sit there. Well, the landlord has an opportunity to press the tenant if it thinks that the quality of the hotel, operations and maintenance under 6.5 are a problem. But just a strict decline. We're running the hotel fabulously. We're running it according to the pre-'79 standards, but the gross revenue is going down slightly every year or maybe even more than slightly every year? No. Of course there's no remedy because there's three types of rent. It's a normal lease. It's got kind of – it's got minimal rent. It's got additional rent. It's got percentage rent. I mean, it's like a retailer out there. They all make percentage rent. I mean, percentage rent is the green bee. It's like if you do – you know, as long as we're over 18 million, which, as we know from the figures in here, we're over 18 million by threefold, you know, but as long as we're over 18 million, they get a percentage rent. It's just a matter of how much. That's the green bee rent on top of it. They get – the big red here is the minimum ground rent and the additional ground rent. They're based off of the land value. The percentage rent is the tail wagging the dog as it oftentimes is in leases and in this one in particular. So to answer your question – There's more to this than meets the eye. Of course. Yes, in terms of the rent that is being charged here. The history of what was going on between the parties. Of course, yes, of course. There's a lot more going on here because – and this is one of the things I really want to correct because it came through in the briefs and it came through a little bit in the argument. This hotel is owned by my client. This is not a I rented you the land and the hotel. This hotel was bought, paid for, is our property, paid for, fee owned by the tenant. We rent the land. We don't rent the whole hotel. It is true like most ground leases that one of the incidents of having property on – having a building, a structure improvement on property that is ground lease is that at the end of the ground lease that the building – and that's important too because if you look at this lease carefully, you know what reverts to landlord at the end of this – at the expiration of this lease? One thing and one thing only. Well, the land of course. The land is fixed. The building. Not the goodwill. Not the name. All these things that they're claiming about that the tenant is driving into the ground, they don't even have a right to them. They're not theirs. They don't have a right to the goodwill. They don't have a right to the name. They have a right to the physical building. And there's a provision, a very specific provision, 7.1 in the lease, that says how you have to maintain the building. That's what controls what has to be done with this building. Well, you argue that performance under 6.4B is no alternative at all. And yet there are provisions in Section 6.4 that specifically reference the alternative performance. Tenant Covenantson agrees that if you operate the hotel under 6.4B, you're not going to provide less than market rate space to somebody affiliated with you. So you're saying that the 6.4B is really illusory. But there are other provisions of the lease that refer to it. How is it that the parties negotiated these provisions that really don't mean anything in your view? Well, first of all, I need to correct something about it. Because there's a distinction here that has been discussed a lot, both below and into this court, about between 6.4A and 6.4B. 6.4A covers the use of the building as a hotel. 6.4B covers the use of the building as something else besides a hotel. That was a position, if you look at paragraph 18 of even the counterclaim of the landlord. That's what they said. They said that 6.4B is not hotel use. It's not inferior to hotel use. It's just not hotel use. The only way you can run a hotel in 6.4B. And they also threw out on 6.5. They switched their position in the arguments. But in their counterclaim, they said 6.4A is the only way you run a hotel. And that's bolstered by 6.5, which says if you choose to operate a hotel, you've got to do it in a first class, not luxury. They like to say luxury. There's no luxury in the lease. Not one word of luxury in the lease is first class. But still, you have to run it in a first class manner. That's what 6.5 and 6.4A say, as was heretofore run by the landlord. 6.4B is I want to do something else. I want to have a dormitory, to use the example provided in the brief. I want to have apartments, et cetera. What's illusory about it is because under their view, not our view, our view is 6.4A or 2.12 is only implicated for a failure of 6.4A. You tried to run a hotel, but you didn't run it up to snuff. 6.4B is other uses. It doesn't have anything to do with 2.12. But they, the landlord, said no, no, no. What this provision, 2.12 means, although it doesn't reference 6.B, what it really means is that if you choose to do 6.B, which includes other uses, not just even hotel use, then we get the penalty provisions. We get all the increased rent. A, that's not what the provision says. B, that's not the provision that they took in paragraph 18 of their own counterclaim. But if you followed, let's not argue, but if you followed that view to its natural conclusion, then you could never ever, because remember, 2.12 is about the reduction of gross revenues. You have to have the linkage of the reduction of the gross receipts to get anything under it. So if you go to 6.B and you do some other use, the apartment building, and you don't have more revenue than you did the last year you ran the hotel, because remember, you have to have new revenue. It builds on itself, right? It's always got to work. Thank God the Olympics didn't come in at that time. We would have had great revenue one year. We could have never built on it again, right? So you can't, you have to build on that revenue. How can you take a hotel out of service for a year or whatever it would take, convert it into any other 6.B use? How could you? And there are provisions in the lease that contemplate that. I'm sorry? There are provisions in the lease that contemplate that with the permission of the landlord. Right. If the landlord gave you permission to convert to luxury rentals because there was such demand for luxury rental apartments, then the landlord couldn't invoke a reduction in gross receipts Not according to them. I mean, I agree with Your Honor, too, but where does 2.12 say, except for in a year when you might be converting to a 6.4B use? It doesn't say that. That would be a classic breach of the covenant of good faith and fair dealing. And we'll be talking to Your Honors again. But that's my point. It's really no choice. It's no choice under their view, this very strict view of how you read the lease, because in their view, everything that is not pre-'79 or better quality hotel use, coupled with increased gross revenues year after year after year, with no exception, cost 40 years' worth of additional rent. No matter what it is, no matter why it occurred, no matter how long it took, no matter your ultimate thing, say the rentals ultimately in three or five years were better and produced even more, doesn't matter. You have no choice, because your choice is between doing something you're supposed to be allowed to do under the lease, under 6.4B, do something else, which is not what we're doing, so pretty far afield there, but still, you have that choice. But the price tag for that is 40 years' worth of rental. And that's why it's an unenforceable penalty. That is why the GKK said, which also cited the Seventh Circuit, they said the common element to most liquidated damages clause that gets struck down as penalty clause is that they specify the same damages regardless of the severity of the breach, and that could not be more clear here. It's an unenforceable penalty. The trial court was correct in finding that it was an unenforceable penalty. So to answer Mr. Weinberg's question, if that's out, then their only remedy then, it seems to me then, is what you're arguing is 6.5, correct? That would be their only remedy then, to kick you out. If they thought that the hotel was not being run according to the pre-1979 standards, yes. They're not remedying this. The remedy is just like any other provision in the lease that's breached. They call us on it. They send a demand. We respond to it. We have that adjudicated. We argue over things I mentioned before about materiality, and we decide whether it really is below the standards or not. And if so, we have an opportunity to cure. And all that occurs. You don't just get thrown out. And another thing, I know we talk about the nonrecourse keeps coming up. It's worthy of a comment. We all know what nonrecourse means in this room. It means, yes, you can't dig into the tennis pocket beyond. But what's in the tennis pocket that is available to this landlord? The building, everything that's in the building. There's a whole list in the lease of all the things that are attachable. I mean, this is a building, like I said, it goes back to, we own the building. This isn't them just taking back property that they leased to us that they always own. We own the building. We paid money for the building. They get that back. They get the value of that without paying for it. They don't buy it back. Like we had to buy it to begin with. They get it. Okay? They get everything that's in it, all the contents. They get all of that. But, again, that's a remedy for a breach. That's right. Again, I don't see it hidden in the contract. I don't. No, I'm not calling that an unenforceable penalty. That's a consequence of a breach. Right. That is a consequence. Saying, you know, we paid for the building, but they get the building back, that's. . . No, I think the way that. . . Right. I think the way that. . . That's what the contract provides. I agree. I think the concept of the disguised breach is their argument in here and to the lower court and out of this court that there's no breach going on. It's just these alternative remedies. It's not an alternative. It's not an alternative to go under 6.4B. It's a penalty. Okay? And that's what the courts say is that you don't have to have the words. . . You know, we went through that. You don't have to have the words breach and et cetera. That's the point of that. I mean, it's not as though they have no remedy. It's that they don't get to walk in and deprive the tenant out of every protection it has and get this one-size-fits-all damages no matter when the breach, no matter why the breach, no matter how the breach, no matter the cause of the breach. That's what they don't get to do. Without any opportunity to cure, without any opportunity to challenge the damage, et cetera. That's what they don't get. That's the unenforceable penalty. And that's what they're asking for. And so I don't know if Your Honors have more questions. I would say, and we have an alternative basis for asking for this court to affirm. As this Court knows, this Court can affirm on any basis in the record. And we put it in our brief so I don't need to belabor it. But I do believe that our read, of course, of the provisions in the lease to begin with, 2.12, do not really afford for this 40-year. The provisions of the lease. . . How would that operate? If it only operates for the particular year in which there's a deficiency, how does, monetarily, how does 2.12 operate? Monetarily, how does it operate? Well, you find out that you have a deficiency lease year. If it's, you know, remember the link is it's got to be because the hotel wasn't run up to snuff. And you know you have a deficiency lease year because that's just the number. Then for that lease year. . . For that year only, you pay the 12%. That's exactly right. That's exactly right. That's a reason balanced. . . I mean, I still think it might be too big of a number, to be quite honest, on these numbers. But that's what the provision says. Because the provision says, you know, that, you know, there's. . . As has been stated many times in the briefs, there was sort of the. . . The provision 2.12 is sort of set up in these four parts. The first is like this acknowledgement that the lease. . . That's the expectation of the landlord, remember, for two things. That the building would be run the way it had been run before. And that there would be substantial revenues every year. Because that's what the. . . That's what 2.12 is really all about, is substantial revenues. Year over year higher revenues in particular. And then because of that acknowledgement, the tenant agrees that in each lease year. . . You know, if there is a triggered event. . . So because, remember, this lease is one year, one year, one year, one year. . . There's these, quote, lease years, a defined term. That if the tenant acknowledged and agreed that if it failed to use the building for purposes described in 6.4a. . . Not that it used them for 6.4b, but that it failed in 6.4a. . . And if, as a consequence, there was a deficiency lease year. . . Then, and it's not just then. . . It's then and in such event, like during that time period, duration. . . And notwithstanding the other provisions that set the rent. . . For the purposes of determining minimum ground rent. . . With respect to these various years in which they move. . . Because there are some years the rent is set and some years they're variable. . . With respect to the years through which there's a formula. . . You replace the 10% with the 12.5%. But it's in such event. . . It's just during that time period. And then the reason it has to reference those provisions is because. . . In other years, there is no formula to change because there's a set number. And that's all it's really saying there. And then, as if that weren't clear. . . I think there's a very clear clarification. I mean, I don't think Judge Kennedy bought this, to be quite honest. But, yes, I agree with that. But I salute it and I think your Honor should hear it. And I think your Honor should think about it. If you look at the lease provision, or when you have. . . I've looked at it many times at this point. But there's this clarifying language at the end that says. . . The provisions of this whole section. . . This section 2.12 shall not be operative during the periods. . . When the building is used for the purposes described in 6.4a. So, how is that saying anything else? How is that clarification saying anything other than the fact that. . . Listen, if you are doing it according to 6.4a. . . In other words, you are operating it up to snuff. Up to the pre-79 standards. Then, the provisions of this section that bring in this big rent regime. . . And this big change. . . Are not operative. That's not be operative, in other words. So, you know, I just think that provision. . . That clarifies there. . . And it clarifies later in section 43 of the lease too. . . With respect to. . . 43.2 with respect to. . . If there were an extension period. . . Which would require the complete rebuilding of the building. So, we're not anywhere near there. But, in any event. . . I don't see how that provision doesn't clarify. . . That these extreme. . . This extreme remedy. . . Is not operative. And, in other words. . . It doesn't apply. . . When you are operating the hotel. . . Up to standards. So, that has to be. . . At least an opportunity to cure. . . At least a one year by one year look. I mean, maybe you're not operating the hotel. . . Up to standards. . . In one year. But, the next year. . . You bring it back up. Or, in two years. . . You bring it back up. I think that's exactly what that proviso. . . At the end of 2.12 is saying. . . If you are operating. . . It's like a safe harbor. . . If you are operating. . . According to 6.4. . . Then, this whole regime. . . Of rent change. . . Is simply not operative. And, so. . . Even if the language weren't clear above. . . I think it's clear above. . . I think the proviso. . . Drives that home. So, I thank you all for your time today. . . And, your consideration of this matter. Thank you. I'm going to start from the end. . . And, work toward the beginning. . . Of what counsel just said. . . On the single year argument. . . The first thing I would tell the court. . . And, I know you hate to be told. . . There's things you can't take into consideration. But, the reality is. . . They can't raise this argument. They said you can consider anything in the record. . . As a basis to uphold. . . The trial court's ruling. But, in fact. . . The Cincinnati Insurance Company. . . Versus Chapman case. . . Said that's not true. What it says is. . . If the trial court. . . The circuit court. . . In its ruling. . . Expressly made a ruling. . . Rejecting a specific theory of recovery. But, then. . . Made another ruling. . . That gave the party complete relief. Such that. . . It's the appellee. . . And, the losing party. . . Is the appellant. When it goes up on appeal. . . It's the burden. . . On the. . . Losing party below. . . If it wants to preserve. . . The right. . . To rely on. . . Or challenge. . . That part of the ruling. . . That was adverse to it. . . To raise it. . . By cross-appeal. In the Cincinnati case. . . Since the insurance. . . Did you argue that in your brief? Yeah. . . I just want to explain. . . How it worked exactly. . . In the Cincinnati case. . . There was a. . . There were two sets of policies. . . One policy. . . Was for a certain set of years. . . And, another. . . For another set of years. And, the circuit court said. . . One policy. . . Won't. . . Does not have coverage applicable. . . The other one does. . . And, you win. . . Because of the one that does. . . You win 100% of the money. . . You want. . . You want all the relief you got. . . You got it. . . Goes up on appeal. . . The insurance. . . Or, the. . . The party that prevailed below. . . Says. . . Well, I would argue. . . That the court was wrong. . . About that part of the. . . Those policies that said. . . Didn't apply. . . Or, didn't provide coverage. . . The circuit court said. . . No. . . You have to. . . Separately appeal. . . From that by cross-appeal. . . That's the situation we have here. . . The single. . . Theory argument. . . Was rejected. . . Single year argument. . . Was rejected. . . The penalty argument. . . Was accepted. . . And, if they wanted to appeal. . . From the. . . Challenge. . . The single year argument. . . They had to cross-appeal from it. . . The second thing. . . I would tell you is. . . To. . . To see why they're wrong. . . You only have to look at one provision. . . You have to look. . . At section. . . 43.5. . . It's the parallel provision. . . To. . . To 2.12. . . But, for the extended term. . . And, 43.5. . . Expressly says. . . It only covers. . . A deficiency lease year. . . Not. . . A whole span of years. . . They knew how to say it. . . If they wanted it to cover. . . Just a year. . . They knew how to say it. . . They said it in 43.5. . . They used. . . Completely different wording. . . In 2.12. . . So. . . It's. . . The argument. . . Just doesn't hold water. . . And, in terms of that last sentence. . . Of the. . . Of 2.12. . . Which also appears in 43.5. . . By the way. . . All that. . . As. . . The circuit courts say. . . All that means. . . Is that. . . You can't have a triggering event. . . You can't have a triggering year. . . In a year. . . That's being. . . That's a 6.4a. . . It's a. . . Bell and suspenders provision. . . To make sure. . . There's. . . There's. . . No lack of clarity. . . That you can't. . . Precipitate. . . The provision. . . Of the section. . . During a year. . . Where the property is being used. . . For a 6.4a purpose. . . So, I just. . . And, by the way. . . A lot of their arguments. . . 2.12 says. . . Hey. . . If there's anything. . . In Article 2. . . That would. . . Lead you to believe. . . That what we're saying here. . . Is not correct. . . Disregard it. . . It expressly says that. . . So, you can't rely on. . . 2.2 and 2.3. . . To change the meaning. . . Of. . . 2.12. . . In terms of. . . Whether it's. . . Multi-year or not. . . It is a multi-year provision. . . Let me. . . Let me now. . . Turn to the. . . The. . . The main argument. . . That we've been addressing today. . . Note a couple things. . . We spent so much time. . . In the. . . Beginning of my remarks. . . Presuming. . . That. . . There's a breach. . . Let's assume. . . There's a breach of. . . 6.5. . . Or 6.4a. . . Means a breach of. . . 6.5. . . The problem is. . . That's not. . . The right analysis. . . 2.12 says. . . If you. . . Fail to use. . . The property. . . For a. . . 6.4a. . . Use. . . Then certain. . . Consequences. . . May. . . May. . . Follow. . . And. . . What. . . Tennant wants to do is. . . Says. . . A failure. . . To use. . . The property. . . For a. . . 6.4a. . . Use. . . Means. . . Something. . . Like this. . . An attempt. . . To use. . . The property. . . For a. . . 6.4a. . . Use. . . That fails. . . But. . . That's. . . Totally. . . Twisting the language. . . It would be. . . A failure. . . To use. . . The property. . . For a. . . 6.4a. . . Purpose. . . To use. . . It for. . . An apartment. . . It would be. . . A failure. . . To use. . . The property. . . For a. . . 6.4a. . . Purpose. . . To use. . . It for. . . An office. . . Or. . . Or. . . A dormitory. . . Those are all. . . Failures. . . To use. . .  6.4a. . . Purpose. . . The breadth. . . And scope. . . Of 2.12. . . In defining. . . A failure. . . To use. . . For. . . 6.4a. . . Purpose. . . Encompasses. . . A whole range. . . Of possibilities. . . That do not. . . Implicate. . . A breach. . . It's not. . . A breach. . . Of the contract. . . To use. . . It for. . . An apartment. . . It's not. . . A breach. . . Of the lease. . . To use. . . It for. . . A dorm. . . Or. . . An office. . . They're permitted. . . So. . . In order. . . To make their. . . Damage. . . And. . . Breach. . . Theory. . . Work. . . Tenant has to. . . Try to. . . Claim. . . The meaning. . . Of that. . . That wording. . . To cover. . . Only. . . One. . . Scenario. . . The. . . Only. . . One. . . That makes. . . It work. . . Which is. . . A. . . A. . . Failure. . . To use. . . For. . . 6.4a. . . Purposes. . . Is a. . . Is a. . . Use. . . That breaches. . . Section 6.5. . . Which designates. . . Minimum. . . Hotel. . . Standards. . . But. . . That's. . . Not. . . What. . . The wording. . . Says. . . That's. . . Just. . . A. Complete. . . Misreading. . . Of. . . The. . . Provision. . . And. . . Since. . . Inherently. . . 2.12. . . Does. . . Not. . . Address. . . A. Breach. . . It. . . Doesn't. . . Apply. . . To. . . Normal. . . Contract. . . Provisions. . . No matter. . . How. . . Apparently. . . One. . . Cited. . . And. . . I. Think. . . The. . . Case. . . That. . . Illustrated. . . At. . . The. . . Best. . . Is. . . The. . . ICD. . . Publications. . . Case. . . We. . . Cited. . . In. . . That. . . What. . .   Wants. . . To. . . Deal. With. . . It. . . Is. . . I. . . Theoretical. Basis. . . That. . . There. . . Is. . . A breach. . . In. . . Mountain. . . 2.12. . . But. . . That. . . Is. . . Just. . . The. . . Law. . . And. . . If. . . There. Is. . . No. . . Breach. . . Then. . . No. . . But. . . That. . . Doesn't. . . Change. . . The. . . Reality. . . That. . . The. . . Provision. . . Is. . . Still. . . Enforceable. . . Their. . . Attempt. . . By. . . The. . . Way. . . To. . . Equate. . . 2.12. . . Pardon me. . . 6.4.A. And. . . 6.4.B. Just. . . Runs. . . Counter. . . To. . . The. . . Up. . .              And 1.12. There. . . Who. . . Experts. . . Disagree. . . в And. . .      Actually, I wasn't interested. I'm interested in preserving the value of the name, and then we had. . . And I'm just curious. At the end of the lease, if there has been any rage, we don't get them in. We do not get the name. No. They keep that and could use it for some other premises that they think it's valuable. Alright. So. Why don't you finish up? I think that's enough. Thank you. Thank you very much. Ms. Powers and Ms. Weinberg, excellent briefs and excellent presentations. Both of you gave us a lot to think about. We asked a lot of questions. Really appreciate the hard work that you both put in, obviously, to this case. And it's a very important case. We have, I understand, some John Marshall Law students here. And they've heard you. We are going to retire. But we have two prominent, excellent lawyers here and others. And this would be an opportunity, if you would be so gracious. Well, if you could just answer any questions they have, however you want to handle that. But they can have this as a learning experience. And we would appreciate that if you would do so. All right. Thank you very much. Yeah. Yeah.